ROBERTS, J.,
 

 for the Court:
 

 ¶ 1. Norman Ray Smith filed a claim for worker’s compensation benefits based on alleged bilateral knee injuries sustained during his employment as an instrument technician for Masonite Corporation in Laurel, Mississippi. The administrative law judge (ALJ) found that Smith sustained a 15% loss of use to each of his knees. The full Commission affirmed the ALJ’s decision. Smith appealed to the Jones County Circuit Court, but the circuit court affirmed the Commission’s decision. Aggrieved, Smith appeals to this Court. According to Smith, the ALJ erred when she did not find that he was temporarily disabled between the date he reported his injury and the date of his maximum medical improvement. Finding no error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. As of September 2004, Smith had been working for Masonite for twenty-two years. Smith worked as an instrument technician. Smith’s work often required that he climb ladders. However, on September 11, 2004, Smith told one of his coworkers that he could not climb ladders because his knees hurt. Smith’s co-worker told his supervisor, Austin Clement, that he needed to work with someone who could climb ladders. According to Smith, “that’s when it all started.”
 

 ¶ 3. Smith told Clement that he “can’t handle this heavy climbing anymore; my knees can’t stand it.” However, Smith did not tell Clement or anyone else at Masonite that he thought he had sustained a work-related injury. Clement took Smith to see Lynn Mahaffey, an occupational health nurse who was employed by Masonite. The record indicates that Masonite’s on-call physician examined Smith and stated that he could not make any recommen
 
 *568
 
 dations until Smith saw a specialist. Ma-haffey scheduled an appointment for Smith with Dr. Steven Nowieki, an orthopedic surgeon with the Laurel Bone and Joint Clinic in Laurel, Mississippi.
 
 [1]
 
 Dr. Nowieki examined Smith on September 13, 2004.
 

 ¶ 4. According to Dr. Nowieki, Smith was experiencing “patello-femoral syndrome.” Dr. Nowieki recommended that Smith perform exercises to strengthen his hamstrings and quadriceps. Dr. Nowieki also recommended that Smith wear patello knee sleeves to support his knees. Otherwise, Dr. Nowieki recommended that Smith avoid climbing ladders on a repeated basis. Dr. Nowieki released Smith to return to work the next day.
 

 ¶ 5. However, the same day Smith visited Dr. Nowieki, Smith went back to Masonite and met with Mahaffey. The record indicates that Mahaffey gave Smith an application for short-term disability benefits. Smith filled out the application that very day. Under the section titled “date of accident or sickness,” Smith wrote “started few years ago and getting worse.”
 

 ¶ 6. What Smith later described as “a day or so” after his appointment with Dr. Nowieki, Mahaffey called Smith and told him that “we’ve got to file a workman’s comp on this for an accident.” Smith later testified that he responded, “what accident? I didn’t have an accident.” Smith then called Dr. Nowieki and told him, “[l]ook, this is not an accident; I don’t think its work-related.”
 

 ¶ 7. According to Smith, Mahaffey told him to go home and wait for someone to contact him. Smith testified that he called Mahaffey three weeks later, and Mahaffey told him that there had been no changes at that time. Smith testified that he next heard from Masonite approximately twenty-six weeks later, informing him that his short-term disability benefits would soon expire.
 

 ¶ 8. At some unspecified time between September 2004 and the expiration of his short-term disability benefits, Smith consulted with an attorney. According to Smith, he “thought Masonite had done something wrong at one time.” Smith added that:
 

 it just didn’t seem right. I mean, I got a knee problem; I did not know what caused that knee problem. Nobody would really tell me what caused that knee problem. And, I mean, I’m sitting at the house going broke. Nobody is telling me nothing [sic]. And I felt that Masonite had done something wrong, so I went to see [an] attorney. I thought [Masonite] had violated the American Disabilities Act laws is what I thought, and I went and talked to [an] attorney in Jackson.
 

 That attorney obtained Dr. Nowicki’s initial report, in which Dr. Nowieki opined that Smith’s condition was related to his employment at Masonite. However, Smith did not do anything at that time. He opted to continue receiving short-term disability benefits.
 

 ¶ 9. Smith estimated that it was during the following March or April that he went to Masonite to “try to work out whatever was going to happen with the temporary disability.” Smith testified that Masonite met with him regarding converting his short-term disability benefits to long-term disability benefits. During that meeting, Smith gave Masonite a copy of Dr. Now-icki’s report indicating that Smith’s knee pain was work related. To reiterate, Dr.
 
 *569
 
 Nowicki drafted that report before Smith contacted him and informed him that his condition was not due to a work-related accident. In any event, Mahaffey asked Smith how he wanted to proceed. Smith responded that he did not know. Mahaf-fey put Smith in contact with Bryan Huck-abay, Masonite’s health and safety manager.
 

 ¶ 10. Huckabay called Smith approximately one to two weeks later. Huckabay asked Smith whether he was going to change his position that his injury was not related to his employment. Smith told Huckabay that he was going to change his position. Huckabay then informed Smith that he could come back to work because they were going to accommodate his restrictions. According to Smith’s deposition testimony, Smith told Huckabay, “[w]ell, if you had work for me, you’d have had it seven months ago.” Smith also told Huckabay, “coming back down there was not an option.” Smith explained his response. According to Smith, “[t]he reason I said that’s not an option, I was there for twenty-two years and my knees are damaged because of working down there. Why would I want to go down there and get back into the same situation and make my knees worse?”
 

 ¶ 11. On May 2, 2005, Smith filed a petition to controvert. Within his petition, Smith stated that he had sustained a com-pensable injury on September 11, 2004. He described his compensable injury as a bilateral injury due to “cumulative impact caused by vertical climbing.”
 

 ¶ 12. Dr. Kendall Blake, an orthopedic surgeon, examined Smith during November 2005. Smith told Dr. Blake that his knees began to hurt approximately two to three years before September 2004. Smith also told Dr. Blake that he had worked for Swift Transport as a truck driver for approximately five weeks beginning sometime in October until the end of November 2004. Smith stopped working for Swift for reasons unrelated to knee pain. Additionally, Smith told Dr. Blake that he had worked for Federal Express as a truck driver and delivery person for approximately six months. As with Swift, Smith stopped working for Federal Express for reasons unrelated to knee pain.
 

 ¶ 13. Dr. Blake concluded that Smith had mild early degenerative joint disease in both knees. Dr. Blake did not think Smith would ever require surgical knee replacement due to that condition. Dr. Blake noted that, unless he lost weight, Smith had reached his maximum medical improvement at the time he had stopped working for Masonite.
 

 ¶ 14. On February 13, 2006, Smith was examined by Dr. Keith Melancon, an orthopedic surgeon. Dr. Melancon diagnosed Smith with “bilateral patello-femo-ral chondromalacia.” Dr. Melancon opined that Smith could not return to his work at Masonite. Dr. Melancon treated Smith with a series of injections in both knees. Dr. Melancon also permanently restricted Smith from any work that required kneeling, crawling, squatting, and stooping, as well as any work that required climbing stairs or ladders. According to Dr. Melancon, Smith would require knee replacements in both knees. Finally, Dr. Melancon requested that Smith undergo a functional-capacity evaluation (FCE).
 

 ¶ 15. As requested, Smith performed the FCE on December 7, 2006. The conclusion based on the FCE was that Smith was capable of performing physical work at a medium level and that Smith fully performed seventeen out of seventeen tasks without having to limit himself. Ultimately, the conclusion based on the FCE was that Smith’s maximum level of repetitive lifting was thirty pounds. However, Smith could sit, stand, and work standing con
 
 *570
 
 stantly for two-thirds to a full day. Smith was restricted from tasks that required repetitive squatting or climbing ladders.
 

 ¶ 16. On January 2, 2007, Dr. Melancon concluded that Smith had reached maximum medical improvement. Dr. Melancon adopted the FCE conclusions and found that Smith had a 37% impairment rating to both legs. However, Dr. Melancon released Smith to return to work the next day, as long as Smith worked within his restrictions. Finally, Dr. Melancon concluded that Smith would need “total knee arthroplasty on each knee.”
 

 ¶ 17. In August 2007, the ALJ conducted a hearing on Smith’s petition to controvert. On February 26, 2008, the ALJ entered her order. Within her order, which is very detailed and thorough, the ALJ found that Smith’s injuries prevented him from performing his previous position with Masonite. The ALJ also found that Smith sustained a “permanent partial impairment to each lower extremity of 15%.” The ALJ concluded that Smith was entitled to permanent partial disability benefits of $341.11 per week for the 52.5 weeks that followed January 2, 2007, along with any applicable penalties and interest.
 

 ¶ 18. Smith appealed, but the full Commission affirmed without additional comment.
 
 [2]
 
 Smith then appealed to the circuit court, which affirmed the Commission’s decision. Aggrieved, Smith appeals.
 

 STANDARD OF REVIEW
 

 ¶ 19. This Court’s standard of review in workers’ compensations case is well settled:
 

 The Mississippi Worker[s’] Compensation Commission is the ultimate fact-finder. Accordingly, the Commission may accept or reject an administrative judge’s findings. This Court will affirm the Commission’s findings of fact if they are supported by substantial evidence. In other words, this Court will reverse an order of the Workers’ Compensation Commission only where such order is clearly erroneous and contrary to the overwhelming weight of the evidence. Doubtful claims should be resolved in favor of compensation, so as to fulfill the beneficial purposes of statutory law. Unless common knowledge suffices, medical evidence must prove not only the existence of a disability but also its causal connection to the employment. As with any fact-finder, the Commission is entitled to rely upon the evidence and reasonable inferences.
 

 Frito-Lay, Inc. v. Leatherwood,
 
 908 So.2d 175, 179-80 (¶¶ 20-21) (Miss.Ct.App.2005) (internal citations and quotations omitted).
 

 ANALYSIS
 

 I. LOSS OF USE
 

 ¶ 20. Smith claims the ALJ erred when she declined to find that, because he could not return to his previous employment as an instrument technician, Smith was entitled to a 100% loss of use of each of his legs. The ALJ based her finding that Smith had not sustained a total occupational loss of use of his legs on the following: the medical records and physicians’ testimonies; Smith’s post-injury employment; Smith’s “failure to conduct an adequate job search”; and Smith’s training, age, work history, and education. Smith would have this Court find that the ALJ erred. Based on the evidence before the ALJ and our standard of review, we find no merit to Smith’s claim.
 

 
 *571
 
 ¶ 21. “In a workers’ compensation case, the claimant bears the burden of proving by a fair preponderance of the evidence each element of the claim. These elements are: (1) an accidental injury, (2) arising out of and in the course of employment, and (8) a causal connection between the injury and the death or claimed disability.”
 
 Hardin’s Bakeries v. Dependent of Harrell,
 
 566 So.2d 1261, 1264 (Miss.1990) (internal citations and quotations omitted). Disability means “incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment, which incapacity and the extent thereof must be supported by medical findings.” Miss.Code Ann. § 71-3-3© (Rev.2000). The Mississippi Supreme Court has held that:
 

 If the injury prevents the employee from resuming his former trade, work or employment, this alone is not the test of disability to earn wages or the test of the degree of such disability, but the definition relates to loss of capacity in “the same or other employment,” and the meaning is that the employee, after his period of temporary total incapacity, must seek employment in another or different trade to earn his wages.
 

 Sardis Luggage Co. v. Wilson,
 
 374 So.2d 826, 828 (Miss.1979) (quoting V. Dunn, Mississippi Workmen’s Compensation § 72 (2d ed.1967)).
 

 ¶ 22. “In determining whether a claimant has made reasonable efforts to find gainful employment, the facts of each case must be examined individually, because we cannot delineate any hard and fast rule as to how many or exactly what type efforts a claimant must make in every case in order to establish disability within the purview of § 71 — 3—3(i).”
 
 Ford v. Emhart, Inc.,
 
 755 So.2d 1263, 1267 (¶11) (Miss.Ct.App.2000) (citation and internal quotations omitted). However, if a claimant successfully demonstrates a prima fa-cie showing of reasonable but unsuccessful efforts to find suitable employment, the burden of proof shifts to the employer, which must then prove otherwise.
 
 Id.
 
 at 1268 (¶ 13). The following factors “may be” relevant in determining whether a claimant made a reasonable effort to obtain employment in the same or another occupation: (1) “the economic and industrial aspects of the local community”; (2) “the jobs available in the community and surrounding area”; (3) “the claimant’s general educational background, including work skills”; and (4) “the particular nature of the disability for which compensation is sought.”
 
 Id.
 
 at (¶ 12). “Whether the claimant has made a prima facie case is a question of fact.”
 
 Id.
 
 at (¶ 13).
 

 ¶ 23. Smith had an associate’s degree in electronics technology. He also had a Class A driver’s license, meaning he could work as a commercial truck driver. Even after he left his employment at Masonite, Smith worked as a truck driver for Swift and left that employment for reasons unrelated to pain in his knees. Likewise, Smith worked as a truck driver and delivery man for Federal Express, and he also quit that position for reasons unrelated to pain in his knees. Smith also attempted to establish a business building steps for mobile homes. He stopped doing that because the venture was unprofitable — not because his knees hurt. Every physician who treated Smith released Smith to return to work, albeit with restrictions to avoid activities similar to his previous employment at Masonite which involved frequent climbing of ladders. Masonite even offered Smith a position, but Smith refused to return to work at Masonite. Smith testified that he did not return to Masonite based on his concern that he would further injure his knees, but there was no evidence that Masonite intended to place Smith
 
 *572
 
 back in that same position. There was no evidence that Masonite refused to accommodate Smith’s injuries.
 

 ¶24. In
 
 Ford,
 
 a claimant argued that because she could not “perform the substantial acts of her usual occupation she ... sustained a 100 percent industrial loss of the use of her legs regardless of whether she made efforts to obtain other employment.”
 
 Ford,
 
 755 So.2d at 1267 (¶ 10). However, this Court held that the claimant “defeated her own argument by working for six years after the injury,” and “[tjhat fact established that [the claimant] could work.”
 
 Id.
 
 Accordingly, this Court held that the Commission’s decision was supported by substantial evidence, and we found no basis to reverse the Commission’s decision.
 
 Id.
 
 Physician testimony indicated that Smith’s knee pain was partially related to his weight, which fluctuated at a range between 265 and 280 pounds during the course of his treatment. Smith worked after he left his employment at Masonite. His knee pain did not stop him from working in those positions. Additionally, vocational-rehabilitation expert Pete Mills testified that he provided Smith with multiple lists of potential jobs within his restrictions, and Smith applied for only four of those positions. Otherwise, Smith testified that he reviewed two or three sources in which employers advertised available positions, but he did not apply to one potential job through those sources. Dr. Melancon released Smith to return to work in January 2007. Smith did not apply for any work for the next three months. As of the date of the hearing, Smith had not applied for work in six months. The results of the FCE indicated that Smith had some limitations, but there was no conclusion that Smith was completely unable to work. Based on the totality of the circumstances and our deferential standard of review involving questions of fact, we find no merit to Smith’s claim that the ALJ erred when she declined to find that Smith suffered a total occupational loss of use of his legs.
 

 II. LACK OF A MEDICAL IMPAIRMENT
 

 ¶ 25. Smith claims the ALJ “erred by failing to make a finding as to the claimant’s percent of medical impairment.” The ALJ found that Smith had a 15% permanent partial impairment to each lower extremity. According to Smith, the ALJ should have found that Smith had a 37% medical impairment rating to each lower extremity as determined by Dr. Me-lancon.
 

 ¶ 26. Smith’s argument is based on the principle that an employee who suffers an injury to a scheduled member resulting in permanent partial disability is entitled to “the greater amount of compensation determined under two alternate theories of computation.”
 
 Hollingsworth v. I.C. Isaacs and Co.,
 
 725 So.2d 251, 254 (¶ 10) (Miss.Ct.App.1998). The first theory of computation involves determining the functional disability of the member and then determining the appropriate level of compensation by multiplying the percentage of disability times the maximum number of weeks for the scheduled member and then multiplying that figure by sixty-six and two-thirds percent of the employee’s average weekly wage.
 
 Id.
 
 This is the method the ALJ used in this case. The second theory of computation involves determining the employee’s industrial disability.
 
 Id.
 
 An employee’s industrial disability is based not only on the medical evidence, but also upon the evidence demonstrating how the employee’s limited functioning member affects the employee’s ability to perform the duties normally associated with his job.
 
 Id.
 

 
 *573
 
 ¶ 27. According to Smith, the ALJ should have utilized the second method and found that, pursuant to Dr. Melan-con’s opinion, Smith’s medical impairment was 37%; therefore, Smith contends he is entitled to a higher rate of compensation. We disagree. “[T]o show industrial disability, the claimant bears the burden of proving medical impairment
 
 and
 
 a loss of wage-earning capacity as a result of the medical impairment.”
 
 Ford,
 
 755 So.2d at 1266 (¶ 7) (emphasis added). Here, there was evidence that there were positions available in which Smith could work despite the defined physical limitations imposed by the loss of some function in his knees. “Though the compensation laws contemplate the right of judicial review of the Commission’s determinations, this Court is limited in its authority to review such determinations, and is required to give great deference to the work of the Commission.”
 
 Hollingsworth,
 
 725 So.2d at 254 (¶ 11). It is not within the realm of our authority to re-weigh the evidence.
 
 Id.
 
 Instead, we are obligated to affirm if there is substantial evidence to support the Commission’s findings.
 
 Id.
 
 at 254-55 (¶ 11). Pursuant to that obligation, we find no merit to this issue.
 

 III. TEMPORARY DISABILITY BENEFITS
 

 ¶ 28. In his final issue, Smith claims the ALJ erred when she found that all temporary disability benefits had been paid. According to Smith, the ALJ correctly found that Smith reached maximum medical improvement on January 2, 2007. Smith notes that the parties had stipulated that Masonite had only paid temporary disability benefits from September 14, 2004, through April 10, 2005, and also from February 13, 2006, through February 11, 2007.
 

 ¶ 29. However, Smith refused to return to work when Masonite offered him a position in April 2005. Smith began to work for Federal Express in May 2005. Until February 13, 2006, no physician instructed Smith to avoid returning to work. Accordingly, we find no merit to this issue.
 

 ¶ 30. THE JUDGMENT OF THE JONES COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . There was some dispute as to whether Ma-haffey recommended Dr. Steven Nowieki, or whether Smith selected Dr. Nowieki from a number of potential examining physicians that Mahaffey named.
 

 [2]
 

 . Under the circumstances, the ALJ is referred to as the fact-finder, rather than the full Commission.